## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

---

Barry Sewall, on behalf of himself individually and all others similarly situated,

Court File No.: _____

Plaintiff,

**CLASS ACTION COMPLAINT**

v.

**JURY TRIAL DEMANDED**

Home Partners of America, Inc., HP Minnesota I LLC, and Pathlight Property Management Inc.

Defendants.

---

Barry Sewall, individually and on behalf of others similarly situated, for his complaint, states and alleges as follows:

### INTRODUCTION

1.      A bedrock of landlord-tenant law is that landlords, not tenants, are responsible for ensuring that the homes they rent are in "reasonable repair" and in compliance with applicable health and safety laws unless the disrepair has been caused by a tenant's "willful, malicious, or irresponsible conduct." Minn. Stat. § 504B.161. These mandatory landlord duties and the rights they confer on tenants, the Covenants of Habitability, originated in common law but were codified in Minnesota Statutes. Minnesota's and other states' laws thus explicitly forbid landlords from entering into agreements with tenants that waive or modify the Covenants.

1

2.      Nonetheless, under the guise of offering a potential home to own, Defendants routinely enter into adhesive leases that purport to waive and modify the Covenants through several different lease provisions found in Defendants' uniform adhesion contracts. During and at the end of tenancies, Defendants go after their tenants for payment of pre-existing or other damage to Defendants' real and personal property, which was not caused by the tenants at all, much less due to "willful, malicious, or irresponsible" conduct. This conduct violates the Covenants and statutory consumer protection laws.

3.      Defendants are some of the many corporate investors of residential real estate who have swarmed into metropolitan area real estate markets, hoping to profit from the growing demand for single-family homes.

4.      Large private equity groups, hedge funds and other large investors spent a combined $36 billion on more than 200,000 homes between 2011 and 2017. In effect, these large entities are building a new corporate landlord-tenant scheme across the country.[1]

5.      While large corporate entities have been involved in the housing market since before the 2010 foreclosure crisis, their involvement only continues to grow. These corporate landlords claim their buying efforts will stabilize the country's most dilapidated housing markets, and further claim they will be even

---

[1] https://www.theatlantic.com/technology/archive/2019/02/single-family-landlords-wall-street/582394/ (last visited Feb. 28, 2022).

better landlords than traditional, local landlords by using their capital to maintain the homes, and make home rentals easy and affordable. However, over time, these corporations have displaced individual home buyers (or individual landlords and property owners) not only in housing markets decimated by foreclosure, but also in healthy urban, suburban and exurban residential real estate markets, leading to "higher prices throughout the market, greater competition at the time of sale, and out-of-state landlords showing less care for properties and renters."[2]

## PARTIES

6.    Barry Sewall is an adult residing in Bloomington, Minnesota, and is a citizen of Minnesota.

7.    Defendant Home Partners of America, Inc.  ("Home Partners") is incorporated in Maryland with its principal place of business in Chicago, Illinois.

8.    Upon information and belief, Defendant Home Partners or one of its subsidiaries operates and purchases homes through separately incorporated shell limited liability companies ("LLCs") in each state where it does business, including Minnesota, but Defendant Home Partners (or one of its officers or employees) is a member of those LLCs. Defendant HP Minnesota I LLC, an LLC incorporated in the State of Delaware with its principal place of business in Chicago, Illinois, is one of these LLCs. Defendant HP Minnesota I LLC and these other LLCs were, at all relevant times, the agent, servant, employee, alter-ego or joint venture of

---

[2] https://www.startribune.com/national-investors-are-snapping-up-twin-cities-area-houses-to-rent/600123709/ (last visited Feb. 28, 2022).

Defendant Home Partners, and acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture, and with the permission and consent of each of the other Defendants.

9. Defendant Pathlight Property Management Inc. ("Pathlight") is a subsidiary, agent, and alter ego of Home Partners of America. Pathlight is incorporated in California with its principal place of business in Plano, Texas.

## JURISDICTION AND VENUE

10. This Court has original subject matter jurisdiction over this controversy pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because Plaintiff and members of the proposed Class are citizens of states different than Defendants' home states, and the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs.

11. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

12. This Court has personal jurisdiction over Defendants because they have conducted substantial business in this judicial district; they intentionally and purposefully market, promote, and place their homes into the stream of commerce throughout the United States; and both Home Partners and HP Minnesota I LLC have a principal place of business in Chicago, Illinois.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Defendants drafted their contracts of adhesion and

marketed, advertised, leased and sold the affected homes, as well as conducted extensive business, within this District. In addition, Defendants Home Partners and HP Minnesota I LLC have a principal place of business within this District.

## FACTUAL ALLEGATIONS

### I.    Defendants' Lease to Purchase Scheme

14.    Defendants collectively own, lease, and manage approximately 17,000 homes in 70 markets located in 32 states. Cementing their alter ego relationship, Pathlight states on its website that both Pathlight and Home Partners "are proud to offer" lease programs to prospective tenants.[3]

15.    Defendant Home Partners is now a subsidiary of Blackstone Inc., a New York City-based investment firm.[4] In a $6-billion dollar deal, Blackstone purchased Defendant Home Partners through an investment fund called Blackstone Real Estate Income Trust.

16.    Blackstone is one of many large firms to capitalize off of the 2010 foreclosure crisis precipitated by the Great Recession. As thousands of families lost their homes, the federal government launched a pilot program that allowed Blackstone and other private investors, some of whom facilitated the financial crisis in the first place, to purchase swaths of foreclosed homes from Fannie Mae.

---

[3] https://www.pathlightmgt.com/

[4] https://www.wsj.com/articles/blackstone-bets-6-billion-on-buying-and-renting-homes-11624359600 (last visited Feb. 2, 2022).

17.     Against this background, Home Partners and Pathlight entered the residential real estate market in 2012 as real estate investment and property management group, claiming that by purchasing homes on behalf of residents in markets nationwide, they would help thousands of home-seekers live in a home they otherwise were not yet ready to purchase, under terms that best fit their needs.

18.     Defendants state they rent single-family homes to persons in three primary demographics: (1) recent transferees to an unfamiliar or new city or suburb; (2) persons desiring to live in a single-family home, but who lack the creditworthiness to obtain a mortgage; and (3) persons who want to rent a single-family home but who are "uncertain" about home ownership.

19.     Defendants peddle to these demographics through targeted marketing to real estate agents, and through online and print advertisements that advertise the availability of homes. Defendants market themselves as a joint entity: Pathlight's web site contains a Home Partners' logo, demonstrating their interlocking relationship, and Home Partners' web site states, "[f]rom the beginning, Home Partners and Pathlight communicate with residents throughout the entire process. Once the house has closed and the Make-Ready renovations have been completed, Pathlight will send a Welcome Email to residents that

outlines the move-in process and answers questions that may arise during the lease term."[5]

20.     Defendants market extensively through their own web sites as well as local real estate agencies like Century 21, Edina Realty, and Coldwell Banker.

21.     Once a prospective tenant expresses interest in a particular property, Defendants together claim that they expend significant effort and resources to purchase a particular home on the prospective tenant's behalf. Though Defendants claim in their form documentation that they are purchasing properties specifically selected by a prospective tenant prior to rental, Defendant Home Partners (either wholly or through its alter ego LLCs) likely already owns the home. Indeed, a recent search of Pathlight's property listing of available homes in the Minneapolis-St. Paul area yielded 70 available homes in all corners of the metropolitan market.[6]

22.     To induce persons to go through Home Partners and the lease-to-purchase program, Home Partners represents that "[o]nce a home is identified and approved by Home Partners, Home Partners will attempt to purchase the home – the outcome of which will depend on certain conditions being met such as agreeing on a purchase price with the seller, a satisfactory inspection, attorney review of the

---

[5] https://www.homepartners.com/faqs/Move-In-Pathlight/Pathlight-Property-Management-/When-does-Pathlight-become-the-main-point-of-contact-for-incoming-residents (last visited March 3, 2022).

[6] https://www.pathlightmgt.com/metro/minneapolis-st-paul?sort=available_date-desc (last visited March 3, 2022).

purchase contract, and other closing conditions being satisfied."[7] Home Partners thus represents the house is "qualified" and has passed its inspection.

23.     Pathlight further represents, for every home that is available for lease, that the home is "[p]rofessionally managed by Pathlight Property Management, the exclusive property manager for Home Partners of America, offering excellent customer service, 24/7 emergency maintenance service, online application and payments, and pet-friendly options."

24.     For each house, Defendants set both a monthly base rent for each year in which a tenant occupies a house. Base rent increases by up to 3.75% year over year, which is above average for the metropolitan Twin Cities and other areas where Defendants rent homes. Defendant also establishes an "Estimated Acquisition Cost" (also defined in Defendants' form documents as the "Purchase Price")[8] if the tenant chooses to exercise the "right" to purchase during or at the end of the lease. Incorporated into the Estimated Acquisition Cost are "make ready" costs allegedly expended by Defendants prior to move in and during the tenancy.

---

[7] https://www.homepartners.com/how-it-works (last visited February 25, 2022).

[8] The Estimate Acquisition Cost is the product of the house's "baseline purchase price," which is not the actual cost to Defendants to purchase the house, but rather, the cost to Defendants with a substantial increase, and a flat cost "maintenance adjustment," defined as a "make-ready costs price adjustment," meaning Defendants seek to recoup from their tenants/would-be purchasers the maintenance and repair costs that they are obligated to bear as landlords.

25.     Defendants state and admit they do not negotiate these amounts with tenants,[9] and unilaterally set the house's estimated purchase price above the actual amount expended to purchase the house, closing costs included.[10] Nonetheless, in contradiction of the foregoing statements, which are provided to the general public and tenants before they sign any lease, Home Partners later represents in its form adhesion leases that "the amount of Rent was negotiated with the express understanding that Tenant will be responsible for the maintenance needs of the Premises."

26.     Home Partners is not a lender. Consumers who wish to exercise the option to purchase must secure a mortgage from a third party, just as with any traditional home purchase. Home Partners does not apply or credit any amount paid in rent or on maintenance or repair during the lease term to reduce the purchase price or to be applied as a down payment. In other words, consumers who rent through Defendants do not build equity in the home. Only 20% of the persons who enter the lease-to-purchase agreements with Home Partners eventually purchase the home.

27.     At bottom, and as further described herein, Defendants' lease-to-purchase program is an elaborate ruse designed to induce and convince

---

[9] https://app.pathlightmgt.com/help/detail/Lease-Information/360043853871/Is-rent-negotiable (last visited March 3, 2022).

[10] https://www.homepartners.com/how-it-works/the-math (last visited March 3, 2022).

prospective customers that they are renting a specially chosen, "qualified" i.e., quality home that is different than, and an alternative to, a traditional rental—and then to convince consumers to agree to take on substantial homecare burdens foisted on tenants by Defendants' adhesive form leases.[11] Despite their effort to establish an extra-legal relationship with their tenants through these elaborate contracts of adhesion, Defendants cannot write their way out of their statutory legal obligations to their tenants.

## II. Defendants' Form Contracts Shift the Burden of Repair Onto Tenants.

28. Since at least 2016, Defendant Home Partners has included provisions in its carefully crafted form leases that illegally purport to shift its "reasonable repair" obligations onto tenants, including for situations where the damage is not caused by the Tenant's "willful, malicious, or irresponsible" conduct:

- **"Tenant shall, at Tenant's expense, maintain the Premises (including all appliances, systems and fixtures located thereon…)…and keep same in a clean, safe and healthy condition and in good working order."** (emphasis in original)

- **"Tenant agrees to pay for (a) all repairs, maintenance or replacement required to the Premises,** including the walls,

---

[11] https://www.homepartners.com/how-it-works/program-summary?position=advantages (last visited March 3, 2022).

windows, storms (*sic*) doors/windows and screens, ceilings, paint, plastering, plumbing work, pipes, and fixtures belonging to the Premises, whenever damage or injury to the same shall have resulted from misuse, waste or neglect by the Tenant…" (emphasis in original)

29.     Defendant further disclaims in its form leases any obligation to comply with the Covenants of Habitability, stating that "Tenant hereby represents, warrants and acknowledges that it is leasing the Premises in its 'AS-IS, WHERE-IS, WITH ALL FAULTS' condition, fitness for any particular purposes, merchantability, habitability or any other warranty of any kind, nature, or type whatsoever[.]" These provisions are designed to obscure, mislead and misrepresent Defendants' true legal obligations to renters.

30.     As further evidence of its intent to mislead and misrepresent obligations to renters and to shift the costs of repair onto tenants, Home Partners represents that as a component of its lease-to-purchase program, the parties have a "mutual responsibility to maintain the home," in contrast to the traditional landlord-tenant relationship, and that this alleged "mutual responsibility" creates an advantage for the tenant over the traditional landlord-tenant relationship.[12] Defendants fail to disclose, however, that nothing in their unwieldy, lengthy

---

[12] https://www.homepartners.com/how-it-works/program-summary?position=advantages (last visited Feb. 28, 2022).

"Residential Lease Agreement" can abridge a tenant's rights, nor does the lease create anything other than a traditional landlord-tenant relationship.

31.     Defendants' "as-is" and burden-shifting repair provisions mislead consumers about their guaranteed rights and remedies under Minnesota law by misrepresenting to consumers that they, not Defendants, are required to keep Defendants' properties in reasonable repair. Thus, in addition to misrepresenting tenants' rights, Defendants' leases are agreements with tenants that purport to waive or modify the Covenants of Habitability in direct violation of the law.

32.     Defendants' burden-shifting maintenance and repair provisions not only contravene the Covenants of Habitability, but also deceptively and misleadingly suggest to tenants that their signatures on the lease constitute a waiver of their right to habitable housing. Such unlawful provisions have and continue to have the effect of fraudulently stripping Minnesota consumers of their legal rights and burdening them with repair efforts and expenses that the law explicitly requires Defendants to bear.

33.     Defendants obtain an independent inspection and property appraisal, allegedly for the benefit of the tenant, yet none of the Defendants provide tenants with the inspection report or the appraisal. Instead, these provisions are given to Defendants and undertaken on Defendants' behalf prior to Home Partners' purchase of the home. As owners and property managers of the home, they are in the best position to obtain and provide that information. Thus, no Defendant

discloses the existence of any pre-existing damage to the home of which they may have already been aware.

34. Defendant Pathlight further represents that due the fact that the property being purchased will be a rental, county or municipal inspections may occur only after Home Partners closes on a home, allowing Defendants to rent the home under local licensing requirements. Therefore, not only may a property be unavailable for rent upon closing, but it may not be available until it passes the mandatory inspection. Pathlight does not disclose the results of these inspections.

35. During the tenancy, and as described herein, Defendant Pathlight often refuses to make even basic repairs, including those affecting health or safety, or to undertake repairs required by the form lease, and suppresses tenants' ability to report their repair concerns and to have repairs completed. This is due in part to the fact that instead of employing a local agent or property manager who personally responds to a tenant's maintenance request, that request is directed to an out-of-town call center or a web site that purports to be managed by Pathlight, which then assigns a maintenance worker, who requires the tenant be on-site to make the repair – that is, if Pathlight agrees to the repair in the first place.

36. Because Pathlight frustrates tenants' attempts to successfully make maintenance requests, the result is a system whereby tenants, not Defendants, are forced to pay for repairs and maintenance that they are not required to make under the lease or Minnesota law.

37.    In addition to paying out of pocket for repairs to Defendants'
properties as they arise, or from their security deposits at the end of tenancy,
tenants also use their own scarce funds every month to comply with Defendants'
so-called "liability coverage" requirement. Tenants are required to procure this
"liability coverage" in the amount of $300,000 ($500,000 for a house with a pool)
for "damage to our property during your lease term."[13] Pathlight force places
tenants in its own "liability program" through its "preferred provider Assurant" for
$13 per month if tenants do not procure their own renters' insurance containing
this coverage, with Defendant Home Partners named as an additional insured on
the policy. However, Pathlight discourages tenants from procuring outside
insurance, stating that "using an outside provider may cost $20 per month or
more."[14]

38.    What Defendants additionally do not disclose is that they intend for
tenants (or their independently procured insurance coverage) to pay for and cover
pre-existing, accidental, or normal wear and tear damage to Defendants' buildings
and real property, not caused by tenants, which are not covered by the typical

---

[13] https://app.pathlightmgt.com/help/detail/Move-In/360043425512/Am-I-
required-to-have-renter's-insurance

[14] https://app.pathlightmgt.com/help/detail/Move-In/360043425512/Am-I-
required-to-have-renter's-insurance

renters' insurance policy.[15] In other words, Defendants deliberately foist the burden of insuring their own real property onto tenants.

39.     Even if Defendant Home Partners did not enforce its illegal lease provisions, these provisions are nonetheless deceptive because consumers who read them or are told of them are likely to believe they are enforceable or that they have contractually waived their legal rights not to be responsible for repairs to Defendants' own property.

## III.   Plaintiff's Experience

40.     Sewall rented a Home Partners-owned home in Minnetonka, Minnesota, beginning on or around July 29, 2016.[16] Sewall was looking to rent a home, and rented through Defendants because their representations, as described above, led him to believe they would provide a quality home that would not require substantial upkeep or maintenance, based upon the assurance of quality and inspection provided by Defendants. Sewall required a low-maintenance home due

---

[15] "Liability insurance provides coverage against a claim or lawsuit resulting from bodily injury or property damage to others caused by an accident while on the policyholder's property...Your landlord's coverage only covers damage to the building's structure. However, if you want to protect your personal belongings, you may want to consider buying a renters insurance." *Renters Insurance*, https://mn.gov/commerce/consumers/your-home/protect/other/renters-insurance/ (last checked Feb. 28, 2022).

[16] The exact address is known; however, because information such as current and former residential addresses can be used fraudulently by third parties, it is not stated in this publicly filed complaint.

to his work, which frequently required out-of-town travel. He was not committed to purchasing the home through Defendants, but considered it a possibility.

41.     Sewall received Defendants' form "Residential Lease Agreement," drafted by Home Partners' lawyers and consisting of 47-clauses and 16 pages of approximately 8-point Times New Roman font, plus numerous attachments and addenda, and which incorporated a "Residential Right to Purchase Agreement."

42.     The written form lease initially set a base rent of $2,970 per month for the first year of the tenancy, with yearly rent hikes of approximately 3.6% year over year. During the fifth and last year of his tenancy from July 29, 2020 through July 29, 2021, Sewall's monthly rent was $3,440. Sewall was not provided an opportunity to negotiate these amounts. Sewall believes this rental amount was above market rates for a similar-sized home in the relevant market.

43.     The lease term was for a period of one year, and was subject to an automatic yearly renewal provision of up to four renewals, i.e., for a total of five years.

44.     Sewall paid the amounts due and owing under the lease during his tenancy, and also maintained and provided evidence that he maintained the allegedly required insurance liability coverage. While Sewall understood that he would be required to pay for utilities, maintain the lawn, change lightbulbs, etc., he did not agree to pay for any pre-existing damage, nor was he provided any reimbursement or consideration for undertaking any repairs.

45.     After moving into the house, Sewall began noticing several issues related to the maintenance and repair of his house, which were not evident upon his move-in inspection. During the entire period of his tenancy, Sewall made repeated maintenance requests to Pathlight regarding continued issues with moisture and wetness in numerous areas of the house, including but not limited to water issues in or near the equipment room, causing the carpet outside the equipment room to be wet (which was also observed by an HVAC repair person in 2018 and reported to Pathlight); condensation or wetness in the equipment and storage room; an improperly draining shower drain in the master bathroom, which more than one plumber hired by Pathlight feebly attempted to address, and which required the plumber to cut a hole in a mid-level bedroom ceiling and install a trap under the drain; and water in the garage after a rain, as well as during most of the winter when thawed ice or snow would seep into the garage. Sewall also reported a poorly-working oven in or around 2020-21.

46.     Sewall reported these maintenance issues to Pathlight through Pathlight's on-line "Zendesk" web portal email, or by calling its 800-number. All of Defendants' tenants were required to report maintenance issues in this manner. Defendants were already aware of pre-existing water damage in the garage because evidence of it existed when Sewall moved in.

47.     In or around 2018, at his own expense and at considerable inconvenience to him, Sewall also had to address an ice dam over the house's front stairs.

48.     Sewall also repaired a pre-existing large gap between the driveway and garage slab floor, hoping it would reduce the constant water in the garage. It did not, leading him to believe the garage water issues were due to a foundation or roof issue that Pathlight would not address because of the "AS-IS" language in the lease.

49.     When it responded to Sewall's requests at all, Pathlight or its agents unreasonably responded, requiring that Sewall be present when its authorized repair persons were on the property, despite the fact that Pathlight had available a network of local real estate agents to whom it provided keys to the property, and who could have been employed to handle these repair appointments.

50.     On or about June 29, 2021, Sewall provided his notice of intent to vacate the property to Pathlight, later requesting that he be permitted to rent for an additional month beyond the expiration of the lease term, i.e., through August 31, 2021. Pathlight permitted Sewall to rent for an additional month, for an additional premium of $860.00, bringing his total monthly rent for the month of August to $4,300.

51.     Sewall vacated the property on August 25, 2021, ensuring his compliance with all of Pathlight's move-out instructions, including the requirement that the property be professionally cleaned. Defendants' real estate agent began showing the property immediately, locking Sewall's cleaner out of the property on or about August 28, 2021, necessitating a return trip by the cleaner.

52.     On or about September 20, 2021, Pathlight sent Sewall its "Security Deposit Disposition." Among the line items in that letter, including false claims of "unpaid rent," "unpaid rent premium," and "unpaid late fees," which Sewall disputed and later resolved, Pathlight assessed Sewall for $15,000 for a "Remediation and Buildback" charge. This charge was shocking and outrageous to Sewall.

53.     In its Security Deposit Disposition, Pathlight did not apply required statutory interest to Sewall's initial security deposit of $5,940.

54.     When Sewall followed up with Pathlight to dispute the majority of the fees assessed in the "Security Deposit Disposition," including the "Remediation and Buildback" $15,000 charge, Pathlight demurred. Pathlight did not respond to Sewall's request regarding the outrageous $15,000 charge until October 1, 2021, stating the charge was "due to a non-reported leak that caused extensive damage to the home. Our records show you were not enrolled in our liability program, therefore charges have been charged back to the account. We encourage you to reach out to your renters policy to see if there would be any coverage." Pathlight attached four close-up pictures to select areas allegedly showing this "extensive damage to the home." Sewall recognized only the photograph showing the access panel the plumber Pathlight hired to cut and install the trap in the bedroom ceiling under the master shower drain. The other pictures were unfamiliar.

55.     Despite claiming on September 20, 2021, that Sewall owed $15,000 for a "Remediation and Buildback," Pathlight was unable to document or support total "remediation" costs in the amount of $15,000.

56.     Pathlight nevertheless continues to pursue Sewall requesting he tender this charge to his renters insurance.

57.     Sewall disputed, and continues to dispute, that he owes Home Partners or Pathlight for any "Remediation and Buildback," and demands a full return of his $5,940 security deposit, plus interest, penalties and other damages provided by law, and any other damages or equitable relief as the Court may order.

58.     As of the date of this complaint, and upon information and belief, Home Partners has sold the house to a third party.[17] The reported pending sale price of $418,000 is approximately $48,000 less than the "Purchase Price" set in Sewall's agreements with Defendants and is less than the taxable market value of $445,700.

59.     Had Sewall known of the burdensome repairs that he would have to undertake while a tenant, or that Defendants would attempt to shift the full costs of maintenance and repair of the home that they alone bear onto him, he would

---

[17] https://www.zillow.com/homes/12817-Jane-Ln-Minnetonka,-MN-55343_rb/1945446_zpid/ (last checked February 25, 2022). The pending sale price of $418,000 is less than the $466,700 "Purchase Price" in the Right to Purchase Agreement Sewall was provided.

have paid considerably less in monthly rent, or would have rented a different house.

## IV.    Numerous Tenants Nationwide Complain.

60.    Sewall is not alone. Across the country, numerous complaints have been lodged against either Home Partners or Pathlight through social media such as LinkedIn or Facebook, through the Better Business Bureau, or in conciliation or housing court litigation, for their failure to return security deposits owed, or to keep their properties in reasonable repair.

61.    As reported by numerous tenants, Defendants often ignore tenant repair requests or wait an inordinately long time before addressing the repair.

62.    For example, the Better Business Bureau contains the following litany of recent complaints:

> MB
> 1 star
> 12/15/2021
> BEWARE, SAFETY HAZARDS. To start, we found an electrical box on the outside wall of our home with open wires touching insulation. Later, our home flooded from the floor of the second story and ceiling of the first story during freezing winter storms. The flood damaged the kitchen and dining room ceilings, kitchen cabinets, trim, drawers, and three different types of flooring (wood, tile, and carpet) in the kitchen, dining area, and living room. Pathlight's homeowners insurance should have covered this per the lease agreement yet I don't even think Pathlight filed a homeowners insurance claim. It took two weeks for the plumbing to be fixed and we were not compensated for staying at a hotel. Despite contacting Pathlight repeatedly and putting in work orders for ALL the damages, it took 4-5 months for them to replace the carpet alone. When they pulled up the pad it was covered in mold. We had told them for months we were living in

a moldy, water damaged home and they did not care!! More safety hazards. In the end, they didn't repair half of the damages from the flood. Pathlight Property Management did not uphold their end of the terms of our lease agreement. To add insult to injury, we never received our $1,995 deposit back despite reaching out to try and receive it. If I could give Pathlight 0 stars, I would!![18]

Paula F
1 star
12/07/2021
One star is even too much for this company. I am a professional and work 10-12 hours a day as does my husband. We choose a rental through this company because they were offering option to buy, however- it has been a nightmare and we have only been in our house for two months. These people are impossible to get ahold of, when you call you are on hold for 20 minutes to an hour then you get someone who cannot help you and say they are transferring you to someone who can and you are on hold another 20 minutes then get hung up on. I had a horrible pool company where they were not even maintaining my pool, they were just checking the water, I sent this video to Pathlight who sent me an addendum after several phone calls and emails to maintain my own pool. I hired a reliable pool company and who comes on Monday? The creepy pool guy from pathlights company to check my water and take a picture of my house! "all of this on video" I was charged 100.00 for a pool maintenance fee which I should not pay as my pool was not maintenance! I also was charged a 13.00 liability charge the second month but I have my own liability insurance and have proven that to them. I get an email stating it was a mistake then the next day I get an email telling me I own it! Do not,,,, I repeat ... I am warning you! I looked over all the red flags and did it anyway, do not rent from these people! If it looks too good to be true

---

[18] https://www.bbb.org/us/tx/plano/profile/property-management/pathlight-property-management-0875-90620230/customer-reviews (last checked March 3, 2022).

believe it!!! I am currently on hold the second time for ten minutes now waiting for the people who "can really help me" trust me this will not happen! I am going to the better business bureau and any social media outlet that I can this is a horrible horrible company![19]

Frank K
1 star
12/06/2021
I moved out, left the property in great shape. The dishwasher worked the whole time I was in the property. They said it wouldn't start, they had no proof of it not working but they replaced the dishwasher without having a repairman come out. They charged me $750 without contacting me. They will not return emails or have any one return calls. They are very unprofessional. Very disappointed with this company ripping me off.[20]

**Complaint Type:** Problems with Product/Service
**Status:** Answered
12/20/2021
I used this company as a rent to own or rent with a right to purchase but had to end/term lease early due to domestic violence. This company uses a property management company called *************************** who is wrongfully withholding my security deposit. Based on ******** laws they have 21 days to return my deposit to me have not done so, the property mgmt company has also not reached out or notified me in any way. I submitted a complaint against ****************** mgmt as well 078942dd-61cc-11ec-a163-0e63a05a1194[21]

---

[19] https://www.bbb.org/us/tx/plano/profile/property-management/pathlight-property-management-0875-90620230/customer-reviews (last checked Jan. 5, 2022).

[20] https://www.bbb.org/us/tx/plano/profile/property-management/pathlight-property-management-0875-90620230/customer-reviews (last checked Jan. 5, 2022).

[21] https://www.bbb.org/us/il/chicago/profile/property-management/home-partners-of-america-llc-0654-88710948/complaints (last checked Jan. 5, 2022).

63.    These are not isolated complaints.[22] Hundreds of these complaints exist. Indeed, private Facebook group called "Home Partners of America—Company of Stolen Dreams" contains over 1,500 members.[23] Only Defendants, however, are aware of the total number of complaints lodged against them, including through Pathlight's online portal and 800-number.

64.    Defendants' advertising that they will quickly make repairs and be available 24/7 misrepresents the service Defendants actually provide. In reality, Defendants sometimes never make requested repairs or make insufficient repairs.

## CLASS ACTION ALLEGATIONS

65.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 and seeks to represent a class of:

> All persons who entered into a rental agreement with Defendants in Minnesota since January 2012 to the present.

66.    The requirements for class certification under Federal Rule of Civil Procedure 23 are met as follows:

> a.    Plaintiff is informed and believes, and on that basis alleges, that between January 2012 and the present (the "Class Period,") there are thousands of persons who have entered into rental

---

[22] https://pathlight-property-management.pissedconsumer.com/review.html

[23] https://www.facebook.com/groups/HomePartnersofAmericaScandalExpose (last visited February 25, 2022).

agreements with Home Partners. As such, the members of the Class are so numerous that joinder of all members in one proceeding would be impracticable.

b. There are common questions of law and fact common to the Class, including without limitation:

  i. Whether Defendants' contracts of adhesion illegally disclaim the covenant of habitability;

  ii. Whether Defendants' lease provisions mislead;

  iii. Whether Defendants' illegally required tenants obtain insurance to cover damage to Defendants' property;

  iv. Whether Defendants have failed to return security deposits in full compliance with the law;

  v. Whether Defendants mispresented the nature of their services through advertising with the intent to induce persons to sign their contracts of adhesion; and

  vi. Whether the members of the Class are entitled to damages and equitable relief, including injunctive and monetary relief.

c. The claims of the Plaintiff are typical of the claims of the members of the Class, who entered into rental agreements with Defendants and are now contractually bound to the misleading and unlawful terms of those agreements that breach the

covenant of habitability and severely limit any recourse available to Plaintiffs and all members of the Class.

d. The Plaintiff will fairly and adequately represent the members of the Class and has retained counsel who are competent and experienced in class action and complex litigation.

67. The requirements of Rule 23(b)(2) are met as described below in Plaintiffs' request for injunctive relief.

68. The requirements of Rule 23(b)(3) are met in that:

a. The questions of law common to the members of the Class predominate over any questions affecting only individual members.

b. A class action is superior to other methods for the fair and efficient adjudication of this controversy. Because the damages suffered by many individual members of the Class may be relatively small in relation to the costs of litigation, the expense and burden of individual litigation make it difficult, if not impossible, for members of the Class to redress the wrongs done to them individually. Furthermore, many of the members of the Class may be unaware that claims exist against Defendants.

c. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its

maintenance as a class action. The names and addresses of the members of the Class are available from Defendants. Notice will be provided to the members of the Class via first class mail and/or by the use of techniques and a form of notice similar to those customarily used in class actions.

## COUNT I
## VIOLATION OF PREVENTION OF CONSUMER FRAUD ACT, MINN. STAT. § 325F.69

69.      Plaintiff re-alleges all prior paragraphs of this Complaint.

70.      Minnesota Statutes section 325F. 69, subdivision 1, states:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

71.      The term "merchandise" within the meaning of Minnesota Statutes section 325F.69 includes services and real estate. Minn. Stat. § 325F.68, subd. 2 (2018).

72.      Defendants have repeatedly violated Minnesota Statutes section 325F.69, subdivision 1, by engaging in fraud, false pretenses, false promises, misrepresentation, misleading statements, and deceptive practices, as described in this Complaint, with the intent that others rely thereon in connection with the rental or sale of their residential properties. Those practices include Defendants' unlawful lease provisions that deceive and mislead consumers into believing they

(a) cannot negotiate their monthly rental rates or cannot negotiate the purchase prices of the home, while forcing them to sign agreements stating they in fact did, (b) must make all repairs to their rental homes, and (b) must pay for renters' insurance or use Defendants' hand-picked "liability coverage" every month to cover the maintenance of and physical damage to Defendants' rental homes.

73.     Defendants' conduct, practices, and actions described in this Complaint constitute multiple separate violations of Minnesota Statutes section 325F.69.

## COUNT II
## VIOLATION OF DECEPTIVE TRADE PRACTICES ACT, MINN. STAT. § 325D.44

74.     Plaintiff re-alleges all prior paragraphs of this Complaint.

75.     Minnesota Statutes section 325D.44, subdivision 1, states:

> A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:
>
> ***
>
> (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
>
> ***
>
> (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;
>
> ***
>
> (7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

\*\*\*

> (13) engages in any other conduct which similarly creates
> a likelihood of confusion or of misunderstanding.

76.     Defendants have repeatedly violated Minnesota Statutes section 325D.44, subdivision 1, by engaging in the deceptive and fraudulent conduct described in this Complaint with respect to the rental of residential properties. Those deceptive acts and practices include, but are not limited to:

      a.    Representing to consumers that they do not negotiate rental rates or purchase prices while requiring consumers to sign leases stating that such amounts have been negotiated;

      b.    Representing to consumers that they must make and pay for all repairs to Defendants' rental homes, when in reality, the law requires that Defendants, not tenants, keep the homes in reasonable repair and in compliance with applicable health and safety laws;

      c.    Representing to consumers that they must pay for Renters Insurance every month to cover the maintenance of rental homes when Minnesota law requires that they, not tenants, keep the homes in reasonable repair and in compliance with applicable health and safety laws;

77.     Defendants' conduct, practices, and actions described in this Complaint constitute multiple separate violations of Minnesota Statutes section 325D.44, subdivision 1.

## COUNT III
## COVENANTS OF LANDLORD
## MINN. STAT. § 504B.161

78.     Plaintiff re-alleges all prior paragraphs of this Complaint.

79.     Minnesota Statutes section 504B.161, subdivision 1(a), states:

> In every lease or license of residential premises, the landlord or licensor covenants:
>
> (1)     that the premises and all common areas are fit for the use intended by the parties;
>
> (2)     to keep the premises in reasonable repair during the term of the lease or license, except when the disrepair has been caused by the willful, malicious, or irresponsible conduct of the tenant or licensee or a person under the direction or control of the tenant or licensee; [and]
>
> ***
>
> (4)     to maintain the premises in compliance with the applicable health and safety laws of the state, and of the local units of government where the premises are located during the term of the lease or license, except when violation of the health and safety laws has been caused by the willful, malicious, or irresponsible conduct of the tenant or licensee or a person under the direction or control of the tenant or licensee.

80.     Minnesota Statutes section 504B.161, subdivision 1(b), states that "[t]he parties to a lease or license of residential premises may not waive or modify the covenants [of habitability] imposed by this section."

81.     Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 504B.161, subdivision 1(b). Among other things, Defendants' leases, including the

burden-shifting repair provisions, constitute violations of subdivision 1(b) because they are attempts to waive and modify the Covenants of Habitability required by subdivision 1(a).

### COUNT IV
### INTEREST ON AND RETURN OF SECURITY DEPOSITS
### MINN. STAT. § 504B.178

82.     Plaintiff re-alleges all prior paragraphs of this Complaint.

83.     Minnesota Statutes § 504B.178 subds. 1-2, state that any "deposit of money" received by a landlord for purposes of securing "the performance of a residential rental agreement or any part of such an agreement" shall "bear simple noncompounded interest at the rate of ... one percent per annum..."

84.     A landlord may not withhold any portion of a security deposit without providing "the tenant a written statement showing the specific reason for the withholding of the deposit or any portion thereof." Minn. Stat. § 504B.178 subd. 3(a)(2).

85.     Defendants' failure to credit interest on security deposits and failure to provide within the mandatory timeframe written statements "showing the specific reason" for withholding violate Minn. Stat. § 504B.178 and evidence bad faith.

### COUNT V
### RESCISSION

86.     Plaintiff re-alleges all prior paragraphs of this Complaint.

87. Defendants control virtually every aspect of Plaintiff's lease agreement as set forth in the general allegations hereof at paragraphs 27 through 35.

88. Defendants' lease agreements illegally and unfairly advantage Defendants through their misleading statements and deceptive practices, as described in this Complaint, with the intent that others rely thereon in connection with the rental or sale of their residential properties. Those practices include Defendants' unlawful lease provisions that deceive and mislead consumers into believing they (a) cannot negotiate their monthly rental rates or cannot negotiate the purchase prices of the home, while forcing them to sign agreements stating they in fact did, (b) must make all repairs to their rental homes because they are rented in an "AS-IS" condition, and (c) must pay for renters' insurance or use Defendants' hand-picked "liability coverage" every month to cover the maintenance of and physical damage to Defendants' rental homes.

89. Defendants represent to consumers that they must pay for Renters Insurance every month to cover all maintenance of their rental homes when Minnesota law requires that they, not tenants, keep the homes in reasonable repair and in compliance with applicable health and safety laws, illegally shifting the burden of maintaining Defendants' own properties onto their renters.

90. Defendants' form lease agreements are unconscionable contracts of adhesion, which are unenforceable as contrary to the public interest, policy and law.

32

91.　Defendants' lease agreements deny consumers the legally cognizable Covenants of Habitability.

92.　Plaintiff and the Proposed Class have incurred out-of-pocket expenses for maintenance costs associated with their leases that should never have been their responsibility to pay as a direct result of the terms of the lease agreement.

93.　As a direct and proximate result of Defendants' conduct, Defendants have received substantial benefits to which they have no entitlement, at Plaintiff's and the Proposed Class Members' expense, including maintenance costs, rent hikes, insurance premiums and other expenses.

94.　Plaintiff and the Proposed Class are entitled to compensation for all of the expenses they were illegally required by Defendants to bear, and that Defendants should have but did not pay.

**COUNT VI**
**DECLARATORY RELIEF**

95.　Plaintiff re-alleges all prior paragraphs of this Complaint.

96.　An actual controversy has arisen between Plaintiff and the Proposed Class on one hand, and Defendant on the other hand, relating to the following matters:

　　a.　Whether Defendants have unlawfully failed to maintain the homes rented by Plaintiff and the Proposed Class.

　　b.　What amounts Plaintiff and the Proposed Class are entitled to receive in compensation.

c.  Whether Defendants unlawfully require tenants to procure renters' insurance to cover damage not caused by tenants to Defendants' building and structures, or to force place them in the "liability coverage" of Defendants' choosing.

d.  Whether the provisions of Defendants' form leases breach the Covenants of Habitability and illegally thrust the burden of repair onto to tenants.

e.  Whether tenants can be forced to sign agreements stating they either negotiated the rental or purchase price of the home when in fact, no negotiations took place.

97.  Plaintiff and the Proposed Class further seek entry of declaratory judgment in their favor which declares Defendants' practices as unlawful, and which provides for recovery of sums determined by this Court to be owed by Defendants to the Plaintiff and Proposed Class.

## COUNT VII
## INJUNCTIVE RELIEF

98.  Plaintiff re-alleges all prior paragraphs of this Complaint.

99.  Defendants will continue their illegal practices and unlawfully deny their tenants the Covenants of Habitability.

100.  Plaintiff and the Proposed Class have been injured and damaged, and are threatened with injury and damage, by Defendants' continued, unlawful refusal to maintain the homes Defendants themselves own, as well as through Defendants'

34

continued use of misleading, unconscionable lease agreements, and Plaintiff and the Proposed Class have no adequate remedy at law.

101. Defendant has acted, and threatened to act, on grounds generally applicable to the individual members of the Proposed Class, thereby making appropriate preliminary and permanent injunctive relief enjoining Defendants and their agents from continuing the unlawful practices alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully asks this Court to award judgment against Defendants as follows:

1. Declaring that Defendants' actions, as set forth above, constitute multiple, separate violations of Minnesota Statutes sections 325F.69, subdivision 1; Minnesota Statutes sections 325D.44, subdivision 1; Minnesota Statutes section 504B.161, subdivision 1(a)-(b); and Minnesota Statutes section 504B.178, and that Defendants' form lease agreements are void;

2. Enjoining Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parents or controlling entities, subsidiaries, and all other persons acting in concert or participation with them, from engaging in deceptive practices and making false or misleading statements in violation of Minnesota Statutes sections 325F.69, subdivision 1, and Minnesota Statutes sections 325D.44, subdivision 1;

3. Enjoining Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parents or

controlling entities, subsidiaries, and all other persons acting in concert or participation with them, from waiving or modifying the Covenants of Habitability in violation of Minnesota Statutes section 504B.161, subdivision 1(b);

4.     Enjoining Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parents or controlling entities, subsidiaries, and all other persons acting in concert or participation with them, from failing to award interest on security deposits under Minnesota Statutes section 504B.177;

5.     Awarding judgment against Defendants for restitution and disgorgement under the general equitable powers of this Court, Minnesota Statutes section 8.31, and any other authority, for all persons injured by Defendants' acts as described in this Complaint;

6.     Awarding Plaintiff his costs and attorneys' fees, as authorized by Minnesota Statutes section 8.31, subdivision 3(a);

7.     Awarding Prejudgment interest; and

8.     Granting such further relief as provided by law or equity or as the Court deems appropriate and just.

**HELLMUTH & JOHNSON, PLLC**


Date:  March 3, 2022                    By: */s/ Anne T. Regan*_____
                                                Anne T. Regan (IL #6280977)
                                                Lindsey L. Larson (*pro hac vice pending*)
                                                8050 West 78th Street
                                                Edina, Minnesota  55439

Telephone: (952) 941-4005
Email: aregan@hjlawfirm.com
llabellelarson@hjlawfirm.com

**ATTORNEYS FOR PLAINTIFF**